IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION


| | | |
|---|---|---|
| OLGA DE LEON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-CV-579 |
| | § | |
| SHIH WEI NAVIGATION CO., LTD., | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANT SHIH WEI NAVIGATION CO, LTD.'S AND
DEFENDANT DONG LIEN MARITIME S.A. PANAMA'S MOTIONS TO
DISMISS FOR LACK OF PERSONAL JURISDICTION**

Plaintiffs Olga De Leon, Daurys Bladimil De Leon, both individually and on

behalf of the Estate of William De Leon, Rafaela De Leon, individually and on behalf of

the Estate of Franklin De Leon, Franklin Roa, Jose Guerrero Marte, and Christian

Encarnacion (collectively "Plaintiffs") bring this action in tort for personal injuries

allegedly suffered by William De Leon, Franklin De Leon, Franklin Roa, Jose Guerrero

Marte, and Christian Encarnacion (the "Stowaways") when they stowed away on the

WELL PESCADORES S.A. and were either left in international waters on a raft or

thrown overboard.  The events giving rise to this action resulted in the deaths of William

De Leon and Franklin De Leon.  Defendant Shih Wei Navigation Co., Ltd. ("Shih Wei")

and Defendant Dong Lien Maritime S.A. Panama ("Dong Lien") each filed a Motion to

Dismiss for Lack of Personal Jurisdiction.  Plaintiffs timely filed a Response thereto, and

1

Shih Wei filed a Reply.  For the reasons enunciated below, Defendants' Motions are both **GRANTED**.[1]

I.      Background

"Give me your tired, your poor,
Your huddled masses yearning to breathe free,
The wretched refuse of your teeming shore.
Send these, the homeless, tempest-tost to me,
I lift my lamp beside the golden door!"[2]

Plaintiffs William de Leon, Franklin de Leon, Franklin Roa, Jose Guerrero Marte, and Christian Encarnacion lived in Santo Domingo, Dominican Republic.  They were allegedly "from the wrong side of the tracks." Pls.' Resp. Ex. A.  In March, 2003, the five men, ostensibly in search of "the golden door," decided to stowaway on a ship that was headed for Houston, Texas.  The WELL PESCADORES was a Panama-flagged ship, and her crew was from China.  The five men boarded the ship via the gangway while the crew was fishing off the side of the ship.

The WELL PESCADORES was time-chartered to BHP Billiton Transport and Logistics Pty. Ltd., Melbourne, but the crew was furnished by Dong Lien, which is a wholly owned subsidiary of Shih Wei.  The crew was responsible for ensuring that no stowaways were aboard the WELL PESCARDORES when it set sail.  Unfortunately, the Stowaways were not discovered before the vessel departed.

When the WELL PESCADORES was about half-way to Houston, one of the Stowaways became ill.  The five men decided to call upon the human compassion of the

---

[1] The Court does not consider this Order worthy of publication.  Thus, it has not requested and does not authorize publication.

[2] These words, written by poet Emma Lazarus, symbolize the hope that emanates from the Statue of Liberty to those who pass by her de-shackled feet and under her torch of enlightenment on their paths to the freedom and liberty that they presume they will find in the United Statues.  Lazarus's poem, *The New Colossus*, is engraved on the great Lady's pedestal.

crew, who were incidentally charged by the International Maritime Organization to "protect, feed, and repatriate stowaways," and made their presence known. Pls.' Ex. A. The crew, who Plaintiffs allege were to receive bonuses if there were no stowaways when they reached Houston, allegedly showed no compassion at all.  Instead, they allegedly threw two of the Stowaways overboard and left the other three men on a raft in the middle of the sea.  Plaintiffs claim that the two stowaways who were thrown overboard never made it to the raft because they could not swim.  The three men on the raft were picked up by another vessel approximately four hours later.  The shark-eaten bodies of the two other men were found some time later. *See* Rainbow Nelson, *How the War Against Terror is Putting Some in Fear of their Lives*, LLOYD'S LIST INT'L, Feb. 18, 2004, *available at* 2004 WLNR 6990252; *see also* Pls.' Ex. A.

Plaintiffs claim that Shih Wei and Dong Lien represented the owner's interests and were, under the charter, solely responsible for the WELL PESCADORES's crew.  As such, Plaintiffs have sued Shih Wei and Dong Lien in tort.  Shih Wei and Dong Lien are both foreign corporations, and they claim that this Court may not assert *in personam* jurisdiction over them.  The Court will discuss the legal and constitutional requirements for a U.S. court to exercise jurisdiction over foreign defendants, then it will explain why it must, regrettably, dismiss Plaintiffs' claims against Shih Wei and Dong Lien for lack of personal jurisdiction.

## II.    Legal Standard

Generally, the plaintiff bears the burden of establishing the Court's jurisdiction over a nonresident defendant. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). However, it is sufficient for the plaintiff to make a *prima facie* showing of jurisdiction,

3

and any conflicts between affidavits are resolved in favor of the plaintiff. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 785 (5th Cir. 1990); *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001).   A nonresident defendant is subject to personal jurisdiction in this District if: (1) the defendant is amenable to service of process under Texas's long-arm statute; and (2) the exercise of personal jurisdiction over the defendant is consistent with due process. *See Stripling v. Jordan Prod. Co., L.L.C.*, 234 F.3d 863, 869 (5th Cir. 2000); *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992).   The Texas long-arm statute grants jurisdiction over a nonresident defendant "doing business" in Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997).   The phrase "doing business" has been interpreted to reach as far as the United States Constitution permits, and therefore the jurisdictional inquiry under the Texas long-arm statute collapses into a single due process inquiry. *See Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993); *Williams v. Castro*, 21 F. Supp. 2d 691, 692 (S.D. Tex. 1998); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356–57 (Tex. 1990).   Whether the exercise of personal jurisdiction over a defendant is consistent with the Due Process Clause of the United States Constitution likewise requires a two-pronged inquiry.   First, the Court must conclude that the defendant has "minimum contacts" with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945).   Second, the Court must determine whether requiring the defendant to litigate in this forum offends "traditional notions of fair play and substantial justice." *Id*; *see also Wilson*, 20 F.3d at 647; *Ruston Gas Turbines*, 9 F.3d at 418.

  *1.  Minimum Contacts*

4

The "minimum contacts" prong can be satisfied by finding either specific or general jurisdiction over a defendant. *See Wilson*, 20 F.3d at 647. A defendant's limited contact with the forum state may support specific jurisdiction if such contact gives rise to the cause of action. *See Ruston Gas Turbines*, 9 F.3d at 419 ("A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted.").

A defendant's contacts unrelated to the cause of action may confer general jurisdiction, but these contacts must be continuous, systematic, and substantial. *See Wilson*, 20 F.3d at 647, 650–51. A defendant's contacts with the forum state may be deemed continuous, systematic, and substantial if the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985) (citing *Hanson v.Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40, 2 L. Ed. 2d 1283 (1958)). Such contacts need not exhibit a physical presence within the state, but they should be "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* at 474–76, 105 S. Ct. at 2183–84 (citing *World-Wide Volkswagen Corp. v. Woodson*, 44 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 490 (1980)). In admiralty cases, if the defendant "is not subject to the jurisdiction of the courts of general jurisdiction of any state," the "forum" for minimum contacts purposes is the "nation as a whole." *World Tanker Carriers Corp. v. M/V YA MAWLAYA*, 99 F.3d 717, 723 (5th Cir. 1996).

*2. Fair Play and Substantial Justice*

5

The second prong of the due process inquiry requires the Court to determine whether the exercise of jurisdiction would violate "'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 325 U.S. at 316, 66 S. Ct. at 158.  However, "where a defendant who purposely has directed his activities at a forum's residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184. The Court may consider factors such as "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" *Id.* (quoting *World-Wide Volkswagen Corp.,* 444 U.S. at 292, 100 S. Ct. at 564). Occasionally, "these factors…serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

## III.   Analysis

### A.  Specific Jurisdiction

Plaintiffs claim that the Court may assert specific jurisdiction over Shih Wei and Dong Lien because this case arises out of the activities of the crew of the WELL PESCADORES.  Shih Wei was indisputably the manager of the WELL PESCADORES during the voyage giving rise to this action, and Dong Lien is listed as the owner on the

time-charter agreement.[3]  Plaintiffs claim that this case arises out of the conduct of the crew and that Dong Lien and Shih Wei were responsible for the crew and its conduct.[4]

Shih Wei and Dong Lien argue that the Court cannot assert specific jurisdiction over them because, while the companies may have been involved in the voyage, they had no control over the destination of the vessel, and thus did not purposely direct any actions at this forum.  The Court agrees with Shih Wei and Dong Lien.  Though the Court is convinced that Shih Wei and Dong Lien provided the crew and that the case arises out of the alleged misconduct of the crew, this alleged misconduct occurred in international waters—not in Houston.  In order to find specific jurisdiction, the defendant's actions must be "directed at the forum state," or the case must have arisen out of a contact defendant had with the forum state. *Ruston Gas Turbines*, 9 F.3d at 419.  Here, neither Shih Wei nor Dong Lien had any purposeful contact with Texas that can be directly linked to the alleged tort.[5]  Accordingly, the Court may not assert specific jurisdiction over Shih Wei or Dong Lien.

### B.  General Jurisdiction

Plaintiffs claim that, even if the Court finds that specific jurisdiction does not exist, it may assert general jurisdiction over Shih Wei and Dong Lien.  In order to find general jurisdiction, Shih Wei's and Dong Lien's contacts with the United States prior to the commencement of this lawsuit must have been continuous, systematic, and substantial.

---

[3] Dong Lien claims that the owner of the WELL PESCADORES was Man Shipping.  However, Dong Lien is defined as the "Owner" in the time-charter agreement, so any responsibilities assigned to the "owner" under that agreement were assigned to Dong Lien.

[4] Dong Lien agreed to this responsibility when it signed the time-charter agreement, and Shih Wei was the operator of the vessel, and thus also responsible for the crew.  Additionally, Plaintiffs claim that Shih Wei and Dong Lien are alter egos.

[5] Shih Wei, Dong Lien, or their agents did have contact with Texas after the alleged tort because the vessel was arrested when it reached Houston.  Under the time charter party, Dong Lien was required to arrange for the vessel's release.  However, this contact was a consequence of the alleged tort, so the tort did not "arise out of" this contact.

*See Wilson*, 20 F.3d at 647, 650–51; *see also World Tanker Carriers Corp.*, 99 F.3d at 723 (holding that, in admiralty cases, courts must determine if the defendant's "contacts with the nation as a whole [are] sufficient to satisfy due process concerns").

Plaintiffs claim that vessels that were owned, operated, or managed by Shih Wei made forty-three to forty-five calls on U.S. ports during the three years prior to the filing of this lawsuit.[6]  Plaintiffs assert that these port calls represent intentional and purposeful contact with the United States because Shih Wei made arrangements for local agents to perform essential services on their behalf while in port.  For example, Plaintiffs claim that Shih Wei, through its Houston agent or agents, performed the following services while the WELL PESCADORES was in Houston: (1) disbursed funds to "various essential maritime providers (such as pilots and dockage);" (2) forwarded unpaid bills to Shih Wei for an emergency surgery and medical treatment for a crewmember; (3) had the WELL PESCADORES repaired for collision damage; and (4) agreed to and signed a "Berth Application and Acceptance of Financial Responsibility."  While these activities may be considered contacts with Houston, they do not represent purposeful availment.  "The 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attentuated' contacts." *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 1478, 79 L. Ed. 2d 790 (1984), and *World Wide Volkswagen Corp.*, 444 U.S. at 299, 100 S. Ct. at 568).  Here, the time-charter agreement indicates that the charterers, with certain limitations, were the decisionmakers regarding

---

[6] Three of the cited port calls merely list "2005" as the date, and, since this case was filed in October, 2005, the Court is unable to determine whether these calls occurred before or after the Complaint was filed. Plaintiffs also list several calls that were made after the Complaint was filed, but the Court can only consider the calls made prior to filing. *See Asarco, Inc.*, 912 F.2d at 787 n.1 (noting that "the relevant time for determining jurisdiction is the filing of the complaint").

the vessel's destinations.  The fact that Shih Wei or Dong Lien were forced to have *essential* services performed at the port of Houston is directly attributable to the charterer's choice to sail to Houston—not to any choices made by Shih Wei or Dong Lien. *See Helicopteros*, 466 U.S. at 417, 104 S. Ct. at 1873 ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."). If Shih Wei or Dong Lien had chosen to have *optional* services performed or entered into contracts with Texas residents that were not essential, then the Court could consider these contacts as purposeful availment.  The contacts associated with the performance of essential services in a port that was not chosen by Shih Wei or Dong Lien, however, cannot be considered purposeful and are, instead, random, fortuitous, or attenuated.

Additionally, Fifth Circuit precedent prohibits the Court from finding that the forty-three to forty-five calls to U.S. ports, in and of themselves, represent continuous and systematic contacts with the United States.  In *Asarco, Inc.*, the Fifth Circuit was presented with a similar question.  The *Asarco* vessel "sailed only on orders from its charterers," and neither the management company nor the owner controlled its destination. *Asarco, Inc.*, 912 F.2d at 786.  The plaintiff asserted that Louisiana courts could exercise general jurisdiction over the management company because ships managed by said company had made twenty calls to Louisiana ports during the five years prior to the filing of the Complaint. *See id.* at 787.  The Fifth Circuit found that these contacts were better characterized as "sporadic than continuous and systematic," and that they were "insufficient to cause [the management company] reasonably to anticipate the

9

possibility of being haled into court in Louisiana." *Id.* Furthermore, because the management company had no control over where its vessels would make port, the Fifth Circuit determined that it could not "be held to have availed itself of the benefits and protections of doing business in Louisiana." *Id.*

Plaintiffs here claim that *Asarco* is distinguishable "because it [did] not involve an area of vessel operations specifically assigned to the owner's sole control." Pls.' Resp. 12. This distinction would be appropriate if the Court were attempting to determine if the *liability* for the alleged tort should be attributed to the owner or manager of the WELL PESCADORES. However, the question before the Court is whether the *contacts with the United States* of the vessels managed by Shih Wei should be attributed to Shih Wei or Dong Lien. Controlling the crew and controlling the destination are two completely distinct areas of control, and any contacts the crews under Shih Wei or Dong Lien's control had with the forums in which the vessels made port were not purposely directed at the forum; the contacts incidental to making port in these forums were merely fortuitous. Accordingly, since Shih Wei and Dong Lien were not involved in the determination of the destinations of the vessels they owned, operated, or managed,[7] the contacts connected to these destinations cannot be attributed to them unless they purposely directed non-essential activities toward the forums while in port.

Plaintiffs argue that, notwithstanding *Asarco*, this Court's decision in *Walter v. Sealift, Inc.*, 35 F. Supp. 2d 532 (S.D. Tex. 1999), supports their claim that the contacts

---

[7] The Court assumes that the time-charter agreements for the other voyages noted were similar. The Court also takes note of the evidence Plaintiff offers regarding two voyages in which the vessels were turned over to the charterer in U.S. waters, which indicates that, for these two voyages, Shih Wei maintained control over the destination until the vessels reached the United States. However, even if the Court considered these two voyages to be contacts that were purposefully directed at the United States, only two voyages that are in no way connected to this cause of action are not indicative of continuous and systematic contacts.

the vessels owned, managed, or operated by Shih Wei or Dong Lien made with the United States should be attributed to Shih Wei or Dong Lien. In *Walter*, this Court held that the minimum contacts prong of the due process analysis was satisfied because vessels that were operated or managed by the defendants regularly called on Texas ports. In that case, one defendant operated a time-chartered vessel that called on the Port of Houston three to four times per year over the past five years. The other defendant managed three time-chartered vessels that each came to Texas three to four times per year. The *Walter* defendants "remain[ed] in operational control of their vessels," regularly sent "employees to meet the vessel[s]," and "contract[ed] with Texas residents to provide repairs, supplies, and crews." *Walter*, 35 F. Supp. 2d at 534.

While this case is analogous to *Walter* in many ways, it is also distinguishable. Like the *Walter* companies, Shih Wei and/or Dong Lien contracted for essential services while the vessels were in port in the United States and provided the crews, but there is no allegation that they contracted with any U.S. companies to provide crews. In fact, the Record indicates that the entire crew was from either Taiwan or China. Also, the instant contacts cannot be said to be as continuous and systematic as the contacts in *Walter*. Here, Plaintiffs cite two relevant Texas-port calls made by two different Dong Lien-owned vessels, and seven relevant Texas-port calls made by seven different Shih Wei-managed vessels.[8] These sporadic calls by various vessels are by no means akin to the *Walter* pattern in which each ship owned or managed by the defendants called on Texas ports three to four times a year consistently for five years.[9]

---

[8] Shih Wei-managed vessels called on Texas ports twice in 2003, once in 2004, and four times in 2005.

[9] Even when one considers the calls made by Shih Wei-managed vessels to various U.S. ports, there is no discernable pattern that gives rise to an inference that Shih Wei's contacts with the United States as a whole were continuous and systematic. Fifteen different Shih-Wei owned vessels called on U.S. ports (including

Furthermore, in *Walter*, the Court emphasized that the defendant "remain[ed] in operational control of their vessels and generally [knew] the precise itinerary of the voyages undertaken by them." *Id.* The Court distinguished the "significant" degree of control the *Walter* defendant maintained from that in *Nicholaisen v. Toei Shipping Co.*, 722 F. Supp. 1162, 1165 (D.N.J. 1989), in which "the lessee directed where the vessel would make port and what duties the crew would perform." *Id.* That distinction cannot be made in this case. The instant charter agreement required the charterers to "furnish the Master from *time to time* with all requisite instructions and sailing directions," and the master was required to "perform the voyages with due despatch [sic]," and "be under the orders and directions of the Charterers as regards employment and agency." *See* Pls.' Resp. Ex. 24 ¶¶ 8, 15 (emphasis added). Thus, the degree of control maintained by Dong Lien and Shih Wei varies significantly from the degree of control maintained by the *Walter* defendant.

Plaintiffs do not present any evidence that Shih Wei or Dong Lien had any contacts with the United States other than the port calls made by vessels with which they were affiliated and the essential services performed in connection with these port calls. These port calls were, for the most part, made at the discretion of the charterers—not Shih Wei or Dong Lien, and they were not continuous and systematic. Accordingly, neither Shih Wei nor Dong Lien has sufficient contacts with the United States to justify the exercise of *in personam* jurisdiction.

---

the Texas ports) once in 2002, nine times in 2003, fourteen times in 2004, and twenty to twenty-two times in 2005. These add up to significantly more calls than were made by the *Walter* vessels; however, the calls are not uniform like the calls in *Walter*. In *Walter*, the same vessels had continuous and systematic contacts with the same ports over a period of time. Because the calls were so consistent, the *Walter* defendants likely developed an expectation that their vessels would regularly be calling on the same Texas ports and had the ability to change this pattern if they did not desire such systematic contacts. The contacts in the instant case, like the *Asarco* contacts, are sporadic—there is no pattern whatsoever.

### C.  Fair Play and Substantial Justice

As the Court noted above, sometimes the factors considered in the fair play and substantial justice prong justify the exercise of *in personam* jurisdiction "upon a lesser showing of minimum contacts than would otherwise be required." *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184.  Thus, even though the Court finds that *Asarco* prohibits it from holding that Shih Wei's and Dong Lien's contacts with this forum satisfy the minimum contacts prong under normal circumstances, the Court strongly believes this particular fact pattern requires at least an exploration into whether justice calls for an exercise of jurisdiction despite the otherwise unsubstantial contacts discussed above.

The fair play and substantial justice prong first requires the Court to inquire whether the burden imposed on Shih Wei and Dong Lien if the case were litigated in this forum renders the forum's exercise of jurisdiction unfair.  "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court of Ca.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033, 94 L. Ed. 2d 92 (1987).  In the instant case, Shih Wei would be required to travel from Taiwan for this litigation, and Dong Lien would have to travel from either Taiwan or Panama.  However, since both companies are involved in international shipping on a relatively large scale and have vessels that call on U.S. ports several times a year, the burden is not as unreasonable as it would be for defendants who are not engaged in international shipping.  Moreover, "often the interests of the plaintiff

and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant," so the Court will next discuss those factors. *Id.*

Even though the alleged tort did not occur in Texas, Texas has a strong interest in the outcome of this dispute. The Stowaways were bound for Texas shores because they believed that this is where they could find the American dream. This, in fact has been the belief of countless immigrants who have—legally or illegally—entered our great country almost since it gained independence. In 2005 alone, 1,122,373 individuals obtained legal permanent resident status in the United States, and 27,366 of these persons were from the Dominican Republic. *See* Dep't of Homeland Sec., Office of Immigration Statistics, *2005 Yearbook of Immigration Statistics* 5 tbl.1, 10, tbl.2.[10] Additionally, 20,831 of the 604,280 individuals naturalized in 2005 were born in the Dominican Republic. *See id.* at 52 tbl.20, 54 tbl. 21. While these statistics give credence to the notion that the United States is a land of immigrants, there are times when the doors are not so wide open. The Department of Homeland Security "found" 4,587 "deportable aliens" from the Dominican Republic in 2005, and 2,929 were deported. *Id.* at 92 tbl.35, 106 tbl.41.

The Court considers this issue at a time in U.S. history when illegal immigration is at the forefront of U.S. and Texas politics. The U.S. Executive and Legislative Branches are in the midst of a national debate over immigration reform fueled by the demand of citizens that something be done about the immigration "problem." The number of illegal aliens that enter the United States through Texas borders is one of the issues under consideration.[11] Some Texans resent the infiltration of illegal immigrants into our State,

---

[10] The Court takes judicial notice of this governmental document under Federal Rule of Evidence 201.
[11] See, for example, *All Things Considered: Plans for 20-Foot Border Wall Rile Texas Residents* (NPR radio broadcast June 15, 2007), *available at* 2007 WL 11289882, in which NPR's Wade Goodwyn interviewed Judge J.D. Salinas of Hidalgo County, Keith Patridge of the McAllen Economic Development

reserving the American dream for those who can afford to wait until they can enter the United States legally.  Other Texans are more forgiving, reasoning that such immigrants often come to the United States in order to raise enough revenue to support their families. Still other Texans can in fact call themselves Texans only because some distant—or not so distant—ancestor was an illegal immigrant.  Regardless of the variety of stands Texans take on the enforcement of immigration laws, all Texans have an opinion.

As the immigration policy of our nation currently stands, Shih Wei and/or Dong Lien faced substantial monetary fines if the Stowaways had made it to the Port of Houston. *See* 8 U.S.C. § 1323 (imposing a fine of $3000.00 per stowaway).  No doubt the possibility of incurring fines led to the institution of Shih Wei's policy to provide bonuses to crew-members if the WELL PESCADORES made it to Texas stowaway-free. This supports the inference that perhaps the crew would not have been motivated to dispose of the Stowaways if Dong Lien and Shih Wei did not stand to incur these fines.  The fines were instituted as part of an overall immigration policy that may soon be changing.[12]  Thus, this case is colored by the very policies that presently are at the forefront of American

---

Corporation, Noel Benavidez, who is a Rio Grande Valley landowner, Russ Knocke from the Department of Homeland Security, and Nancy Brown of the Santa Ana National Wildlife Refuge. The Texas residents and politicians expressed their distress over the federal government's plan to build a 135-mile-long wall along the Texas border, including concerns that it would not work and that it was detrimental to the environment.  Knocke assured the listeners that fencing was an effective way to "slow down someone who's crossing the border."

[12]The Legislature has recently been concerned with whether the United States should institute a guest-worker program—a concept that is fully embraced by the Executive Branch. *See, e.g.*, Robert Pear, *White House Report Lauds Immigrants' Positive Effects*, N.Y. Times, June 20, 2007, at A17, *available at* 2007 WLNR 11539019 (discussing a study that "reinforces President Bush's campaign for a comprehensive immigration bill that calls for more border security, a guest-worker program and a 'merit-based system' of selecting immigrants," and noting that the "bill, pending in the Senate, would also offer legal status and work permits to most of the estimated 12 million illegal immigrants in the United States"). If such a program were to become law, these fines—as applied to aliens who are coming here to work—may become irrelevant.  However, the fines would still be a necessary prophylactic device to prevent aliens who represent a security threat from entering our borders.

consciousness locally and nationally, and is accordingly of immense interest to citizens of Texas and all citizens of the United States.

The third fair play consideration involves Plaintiffs' interest in obtaining convenient and effective relief.  It has been almost four years since the Stowaways were discovered on the WELL PESCADORES.  The dismissal of this case and the probable appeal of said dismissal extend the amount of time the injured stowaways and the family members of the deceased stowaways will be required to wait to litigate—if they indeed are able to litigate at all.  The Court is not aware of any parallel *civil* actions pending in other countries, so it appears that if Plaintiffs are denied relief here, they may not receive monetary relief anywhere.[13]  Thus, Plaintiffs have a very strong interest in maintaining this action.

The final factor a court must consider in the analysis of the fair play and substantial justice prong is the interstate judicial system's interest in obtaining the most efficient resolution of controversies and in furthering substantive social policies.   In an international dispute, a court must "consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." *Asahi*, 480 U.S. at 115, 107 S. Ct. at 1034.

> The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State.

---

[13] Three of the crewmembers were criminally indicted for murder in Panama.  The Panamanian jury convicted the master and first officer of murder and acquitted another crew member.  The captain and first officer face a maximum of twenty years in prison. *See Captain and Officer Found Guilty of Murder*, Safety at Sea Int'l, Aug. 1, 2005, at 8, *available at* 2005 WLNR 13917305.

*Id.*

Humanitarian concerns require an ardent examination of the substantive social policies that permeate this jurisdictional issue. Here, the nations that are touched by this controversy are the Dominican Republic, Panama, Taiwan, and the United States. Unfortunately, neither Plaintiffs nor Defendants offer the Court any arguments regarding the social policies of these nations. It would be conceited for the Court to impose U.S. values on these nations by presuming that U.S. interests and ideals are the same as or superior to those of the other nations. So, the Court will instead consider the interests the other nations have in this dispute and synthesize these interests with general humanitarian principals that transcend national boundaries.

First, the Court will consider the Dominican Republic's interest. The Stowaways boarded the WELL PESCADORES in the Dominican Republic, and the Court presumes that they were Dominican Republic citizens. The Dominican Republic has a strong interest in seeing that any harm that has fallen on her citizens be redressed. This interest may be diminished somewhat in the present case because the Stowaways boarded the WELL PESCADORES in an effort to escape whatever maladies faced them in their home country. Such attempts are generally monetarily driven, and it is highly probable that the Stowaways needed to find better jobs so that they could support their families. Now, the families of the two deceased Stowaways are not receiving any support from them, and the families of the survivors likely have *less* support now than they did before the incident since the injuries suffered by the survivors may have impacted their abilities to work. Thus, in addition to its interest in seeing the alleged harm redressed, the

17

Dominican Republic has an interest in helping its poverty-stricken citizens whose plight has been magnified by these events.

If Plaintiffs had originally filed their Complaint in the Dominican Republic, it is possible that all of these concerns would have been alleviated.  However, as far as this Court has been informed, they did not so file.  The alleged incident occurred almost four years ago, and it is highly likely that the statute of limitations for filing in the Dominican Republic has run. *See Castillo v. Shipping Corp. of India*, 606 F. Supp. 497 (S.D.N.Y. 1985) (stating that the Dominican Republic statute of limitations (in 1985) for a negligence action was six months).  Thus, Plaintiffs may not be able to find relief in the Dominican Republic, and the Dominican Republic's interests in this litigation will remain unfulfilled.

Panama and Taiwan also have interests that must be considered.  Since the case was not brought in those jurisdictions, the Court must ask whether either Panama's or Taiwan's substantive social policies will be furthered or denigrated if the case is heard in the United States.  Obviously, Panama and Taiwan each have an interest in ensuring that their corporations—Shih Wei and Dong Lien—are treated fairly.  Of course, their interests also lie in ensuring that their corporations are not negligent.  These very same concerns would be addressed in the American judicial system, and, even if there were no statute of limitations concerns, it would likely be more efficient to complete the instant litigation—particularly given the depositions that have already been taken—than to start over in a different country.

Even beyond the interests of the individual affected nations noted above is the broader concern of all nations regarding the value of human life.  Stowaways come from

the most impoverished segment of human society.  Different countries may have different philosophies regarding the rights of the poor, but most can agree that nobody deserves to die just because he does not have enough money to pay for passage to the better, more prosperous life he seeks.  Each nation herein affected, indeed each nation of the world, has an interest in ensuring that the basic human right to life is never compromised in the name of profit.  Even if Emma Lazarus's poem can no longer symbolize the United States opening her arms and heart to those underprivileged individuals who come to her seeking refuge, it should at least symbolize that these helpless souls make it here alive.

Given the important and extant social interests implicated in this case, the Court is certainly tempted to find that even though *Asarco* essentially invalidates the contacts Plaintiffs point to, the exercise of jurisdiction is justified.[14]  However, given the substantial weight the *Asahi* Court placed on the "serious burdens" litigating in the United States places on alien defendants, the Court finds that this case unquestionably implicates policy considerations best left to the Circuit and thus leaves it to Plaintiffs to file an appeal if they so agree.

## IV.   Conclusion

---

[14] The social fabric of American life is constantly changing, but, hopefully, the following quote by Thomas Paine will never cease to reflect American ideology: "'He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself.'" Neal Katyal, *Equality in the War on Terror*, 59 Stan. L. Rev. 1365, 1394 (2007) (quoting Transcript of Oral Argument at 83, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) (No. 05-184), *available at* http://www.supremecourtus.gov/oral_arguments/argument_transcripts/05-184.pdf (quoting Thomas Paine, *Dissertation on First Principles of Government* (July 1795), *in* 2 The Complete Writings of Thomas Paine 570, 588 (Philip S. Foner ed., 1945))) (explaining that he (the author) represented Hamdan because, as the son of immigrants who came here because of this nation's "central commitment to equality," he was "deeply patriotic" and concerned that his—and his parents'—"vision of America was being violated"). The fair play and substantial justice prong allows courts some latitude to satisfy this duty in personal jurisdiction analyses, but when the decision is too policy-contingent, it is best to allow the Circuit to determine whether guarding the plaintiffs from oppression is a substantial enough social interest to justify the exercise of *in personam* jurisdiction.

For the reasons discussed above, Shih Wei's and Dong Lien's Motions to Dismiss for Lack of Personal Jurisdiction are regrettably **GRANTED**.  All claims against Shih Wei and Dong Lien are hereby **DISMISSED WITHOUT PREJUDICE**.  Each Party to bear its own taxable costs and attorneys' fees.

**IT IS SO ORDERED.**

**DONE** this 10th day of July, 2007 at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge